May it please the Court, my name is Ethan Ballow and this morning I speak for repellent Teofil Brank. I'd like to begin with the extortion counts and hopefully we have time I can discuss the gun evidence and maybe we can get further than that. With regards to the extortion counts, I'm going to make three arguments this morning if I may. First, I'm going to address the lack of reputational harm being within the ambit of the Hobbs Act and that addresses counts 2 and 5. I'm going to address the argument that the tweet was a fait accompli so there was no inducement to support the convictions under counts 1 and 2. And I'll address count 5 again, that the attempt for a million dollars cash in L.A. did not have sufficient context, did not affect interstate commerce within the meaning of the act. You're not suggesting as a public service that we ban tweets, are you? Excuse me, Your Honor. Never mind. I'll start with reputational harm. The Hobbs Act began as an anti-racketeering statute and it's aimed at prescribing conduct that interferes with interstate commerce. No court to date has validated the government's theory in this case that reputational harm is enough, that fear of damage to reputational harm would support a Hobbs Act prosecution. But that's of the essence of blackmail, isn't it? But we're not talking about blackmail, Your Honor, which he didn't commit, wasn't charged with. We're talking about extortion. And I want to suggest six reasons why fear of reputational harm should not, the court should not go the step the government's asking it to take. The first reason, if we look at the statute, it's focused as an anti-racketeering statute, which was then amended after the Teamsters case. So the Supreme Court permitted violence because of the wage exception of the original act and they changed it in 1946. The focus is still physical harm or economic harm. It's harm to property or person. And fear, the word fear in the statute should be looked at through that prism because that's what the Hobbs Act is looking at. And I would ask the court to take a look at the 12-2 unbanked decision by the Second Circuit in Capo where they discussed the proof in the economic harm status, where you have to have proof that the defendant has a power to affect economic harm against the defendant, against the complainant, and that the defendant would then exploit that power to the complainant's detriment. The second reason I'd ask you to adopt that prism is the common canon of adjucem generis. When we look at the statute, it is focused on harm, physical harm to the person, harm to property. And we look, the statute talks about interfering with commerce by robbery, extortion. It includes attempts and conspires to do so. And then it includes people who commit or threaten physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section. Again, the statute's focused on those concrete harms, which would fear of reputational harm is too ethereal. It would capture stuff like proselytizing. I will threaten you with divine retribution unless I get 10 percent of your salary, Your Honor. I've obviously threatened you. But that kind of ethereal harm, the proselytizing, divine retribution, that wouldn't be within the ambit of the act either. The next reason I'd ask the court to consider this adoption is – Well, before you go beyond that – Yes, Your Honor. I'm sure you're familiar with the Ninth Circuit's jury instructions, forum jury instructions. I am. And that they essentially invite you to put in either economic injury or some other kind of nonviolent harm. Do they not? Yes. I don't think – I think this court has held that the pattern jury instructions are not authoritative and error may be found, despite even if the instruction permitted reputational harm. That would not affect this to no review of the question we're presenting. And I do agree that's an invitation there. And perhaps that's why Judge Walter erred the way he did by permitting this theory. But another reason we adopt this prism is at the time they amended and created the Hobbs Act and Congress changed the Anti-Racketeering Act of 1934, that same Congress that enacted the Anti-Racketeering Act of 1934, which didn't include extortion. It included the crime of coercion. And then the Hobbs Act added robbery, struck coercion, added extortion. They had already in 1934 adopted 875D, which expressly focuses on threats to reputational harm in interstate commerce. Congress, when they passed the Hobbs Act, was aware that this very conduct was subject to federal prohibition and could go to prison for it. So there was no need to expand the Hobbs Act in that way. Let me ask you, yes. Between the two statutes, 18 U.S.C. 875 and 18 U.S.C. 1951, 1951 being the Hobbs Act, I don't know what you call 875. They were both adopted at the same time? No. The predecessor for 875, which I think is 404, was adopted by the same Congress in 1934 that did the predecessor to the Hobbs Act. And the case in the Second Circuit, United States v. Jackson, which we've both cited, does a good job of giving the legislative history of both to note that the Congresses that enacted both statutes were well aware of how extortion was being used. At the same time they passed the 34 Act, Congress passed the Travel Act, which did not define extortion. So 875, its predecessor, which it hasn't changed in any material way, was on the books since 1934, and then the Hobbs Act added extortion to the Anti-Racketeering Act in 1946. Okay. And then they were both amended at the same time together? I believe in 1946. No, I don't believe so. 1948 and 1994, I think. I think 875 was then. It doesn't matter. My question is, what is the difference between the, aside from your problem, certainly 1951 specifically deals with the, well, I mean 875 specifically deals with this type of extortion. And it provides for a two-year sentence for that, whereas it provides for a 20-year sentence for harm to property or person. He was convicted of both. He was. And what is the difference between the two, other than the fact that 875 does specifically deal with the reputational threats and provides a lesser sentence for that? What are the other differences between the two statutes? The difference would be, I think, that 875B focuses on communications in interstate commerce that relate to the extortion, and the Hobbs Act relates to a threat of extortion that affects interstate commerce. So to the extent there's a distinction between effects and in interstate commerce, but since the Supreme Court, both in Cuthbert and Sterone, said the interstate commerce challenge or the interstate commerce purpose of the Hobbs Act is at the zenith of Congress's power, I'm not sure there's any real difference. And I think that relates to my next point. And I think another reason to adopt the interpretive lens I'm urging is, if you take a look at the Supreme Court work on the Hobbs Act in the last decade, they did two cases, NOW 2 and NOW 3. In both cases, despite Sterone and Cuthbert's acknowledgment that the commerce was at the zenith of Congress's power, they both adopted restrictive readings of the Hobbs Act. In an 8-1 decision authored by Chief Justice Rehnquist in NOW 2, they noted that Emmons, which had addressed sort of that the Hobbs Act doesn't address strikes, even strikes with violence, adopted an interpretive lens to make clear that obtaining property was physical property and didn't include rights. And this was about, of course, abortion centers, whether they could sue protesters for interfering with their ability to service their clientele. That court, that case went back down. It came back up in NOW 3. And again, the court adopted a restrictive interpretation of the last clause to show that the threats of violence or physical damage had to relate to extortion or robbery and couldn't be freestanding. So twice in the last decade, the Supreme Court, and in both cases, especially in NOW 3, they focused on, in addition to the language of the statute, did not interfere with the state-federal balance, that they're adopting restrictive lenses on the other elements. And so fear, what does fear mean in the Hobbs Act? It has to mean fear of economic harm or physical damage, property damage. That's the purpose of it. The two last points I'll make on this is the fifth reason you should adopt the construction I'm urging is because the DOJ manual adopted it. Under DOJ policy, you can only bring a Hobbs Act case if you can show physical harm or proper economic harm. That's their manual. So they've adopted it before this case. That's what they instructed their lawyers to look for. They can't bring this case unless under an economic harm theory. And the last reason, I think, is the saving grace. I don't think I have to prove I'm right. I hope I did. But if there's ambiguity about what fear means in this context, and we have 875D, then the rule of lenity should save Mr. Brank. The rule of lenity should be adopted, and you should adopt a theory, a definition of fear that excludes reputational harm. You can't point to Ninth Circuit authority, can you? Or if you have, I'd ask you to point it out. That says that the fear of reputational harm may not be used under the Hobbs Act. No. You're asking this Court to make that limitation in its construction of the statute. Yes, I am. And if I could quickly, before my time runs out, I want to address two other points. What would be the consequence of ruling in your favor? On this ruling? On this issue. On this issue, it would knock out counts 2 and 5, which would also knock out counts 6, and then counts 1, 3, and 4 would remain valid, 875 permitting reputational harm, and 3 and 4 being the receipts of the proceeds of that crime. And he'd be remanded for resentencing, unless I can convince you of my other argument, that the tweet itself wasn't a threat. It was a fait accompli. And if you look at the testimony, the tweet – That would require a remand for recalculation of the – Of course. And the serious – Into the new judgment. Yes. But the inducement I want to get to, because the tweet was a fait accompli, and if you look at the testimony, I'll just give you page sites, and I'll read the quotes to save time. ER 388, ER 390, ER 395, ER 393, ER 400, 403 to 404. Burns gave the money to take down the tweet, not because it was a threat of something else. It was the tweet, and he was lawfully entitled to have that tweet. And he may have stumbled into genius, but he was entitled to post that tweet. Does anyone know Don? Yeah, Don. And he paid him money to take that down, and maybe he paid too much, and maybe he was afraid. And that's all well and true, great. But that's not a threat, and it has to be a threat. It was a done act. And he could lawfully post it, and he could lawfully accept a car for it, and he could lawfully accept $500,000 to do something – How can you separate the tweet from the context of all the prior communications? Well, the tweet comes very early. There's only one prior communication here that's at all worth discussing, and I created an index that they struck for my brief. Another problem is the exhibits don't show the tweets in order, and it's really good to read them in order like we do for e-mails or our texts at home. The only thing he says before that is he opens it up. We haven't talked. Tsk, tsk. How to work with trust is broken. Burns brings up the busted referral. Brank takes offense. Be wise on how you reply. I can bring your house down, Don. This was simple. This was a simple conversation, and now you throw expletive out on me. Don't get me mad. I have Twitter. I have your photos. Lies can be made, or maybe it's the truth. Just saying. That sounds threatening, doesn't it? It's absolutely threatening, but he's not asking for money. They could have charged that as an attempt. If they wanted to, they didn't. And immediately after that, he posts it, and it's over. And the money demands, the money exchange, the money discussion happens after he committed the act. Isn't that the money to avoid what he just said he might do in that email, in that communication? That's not what Burns testified to. I gave you the ER sites. Burns gave him the money, gave him the car to take down the tweet. The government argued that in closing argument. He gave him the money to take down the tweet. I'll give you the government sites of those ERs, too, because that's what happened. And it's the tweets are themselves. The government's argument. Apologize, you're on. Colored pages for a reason. The government argued this at ER 101 and 102. I'd also give you argument at ER 379 to 380 from Burns' testimony. He was afraid of others joining the conversation, others retweeting it, others favoring it, things getting out of hand. But that's not brank threatening action. He took an act and identified what's likely to occur, what could occur. But his activity is over. And he got paid all that money. And he took that car to take down a tweet. And that is lawful. That's not unlawful inducement. They could have charged him with attempt. I'll agree with that. If you indulge me for one minute, your honors, count five, which would get rid of this case in a different way, if I'm correct on the second argument, is he brought a million dollars to a sting in cash from L.A. That is insufficient to establish effect on interstate commerce. All his testimony was about his engagement in interstate commerce, which you'll find on ER 371. I'm the founder and president of the Donald A. Burns Foundation. And in addition to that, I'm chairman of the board of a small public company called MagicJack Vocal Tech. I also manage my own personal development portfolio. The million dollars cash he was supposed to bring to the meet, there's no evidence, there's no direct evidence that affected interstate commerce. It cannot meet the heightened standard of the lynch test under either a depletion of assets theory or any other theory that's been authorized by this court. So count five, attempt should go for that reason. So either those are my arguments that I've prepared. I'm prepared to answer any questions or ask for a vote. Well, thank you.  I did. Thank you, your honor. Thank you. Good afternoon, your honors. May it please the court. Eddie Haragy for the United States. Your honors, I'll begin with addressing the first issue Mr. Ballot raised, which is whether the Hobbs Act encompasses fear by threat to reputation. If you look at the language of the statute, the cases interpreting the statute, and the legislative history of the statute, it's clear that it does. There's no limitation built into the Hobbs Act saying. There's no limitation, but there's no statement that it does, unlike section 875, which covers the same subject basically, but specifically deals with injury to reputation and provides a far lesser sentence for it. That's right, your honor. And I have two responses to that. The first one is you asked Mr. Ballot about the difference between section 875 and section 1951. And the difference is that 875 punishes transmitting communications that are threats, and section 1951 punishes extortion or attempted extortion or conspiracy to extort. So there's a reason why the punishment for 875 is much lower. Well, 875 also punishes extortion. 875d is the statute that we use.  D, your honor. I know. B, I said, punishes extortion. The statute is, as a whole, deals with the same subject matter of extortion and then has a specific paragraph, D, as you say, which deals with extortion by means of reputation. Your honor, I'm looking at 18 U.S.C. section 875b, which also deals with the transmission in interstate commerce of a threat. Yes. No, you were saying that it didn't deal with extortion. Oh, because 875 deals with extortion. And, yes, your honor, what 875 doesn't include is actually acquiring or attempting to acquire the property, which is in 1951. Yes. And the other point I'll make, your honor, is I think the Jackson case by the Second Circuit is extremely instructive, as Mr. Ballot pointed out. And what that case said was that at the time that the Congress was considering section 875 and the predecessor to the Hobbs Act, these two things were enacted simultaneously. And given that 875 specifically contemplated a definition of extortion that included threats of reputation, it was inferable that the Congress also contemplated a definition of extortion that included threats of reputation. It seems to me the inference is just the opposite. When you have two statutes dealing with the same subject of extortion and one specifically includes threats to reputation and the other omits that, you would think that the inference you would draw is that one includes threats to reputation and the other doesn't. Well, and I think, your honor, there's an additional point, a very strong one, that the Jackson court made, which was that it is very clear, and I don't think anybody disputes this, and the Ninth Circuit has also found this in the Cortez case, that the Hobbs Act was premised on the New York Penal Code. And the New York Penal Code had a definition of extortion that included fear by threat to reputation. That was contemplated expressly in the New York Penal Code, which was exposure of secrets. Well, if you really want to say what the Hobbs Act was premised on, it was the idea of labor racketeering. And then it was amended, your honor. And this court and other courts have already said that we're not going to read the Hobbs Act to be specific to racketeering anymore. I understand that, but you don't say, well, it was premised on the New York thing. But they were both amended, both these acts amended at the same time, and one of them still specifically includes a provision for threats to reputation and makes it a far lesser crime. That's right, your honor. The other one was not amended to include that. I just, it seems to me you've got two statutes dealing with the same subject. One adds a specific category, makes it a lesser offense, and the other is not amended to add that, or no one mentions that. If there's any inference, it seems to me that if you, you know, all this business is all inference and theories and what does Congress really have in mind. But if you just look at two statutes side by side that deal with the same subject, are amended at the same time, and one just deals with property and physical harm, and the other includes a specific paragraph to make sure you're covering threats and injury to reputation and makes it lesser, how could you draw any inference if you, maybe no inferences, you know, maybe Congress didn't really have any intent or didn't really know what it was doing. But we're required to look at the two statutes together, I think. That may be the case, Your Honor, but I would also invite the court to look at the third statute, which is the Travel Act. Well, why don't we look at the second statute? I mean, the second statute, 951, makes perfect sense that it wouldn't include reputation because it has force, violence, fear, and the color of official right. These are all things seeming to deal with physical kind of threats. And why, if you look at the two statutes, you say, well, they discussed here things, threats in the real world, rather than things having to do with mental distress. Why isn't that the more plausible way of interpreting, reconciling, if the two need reconciling? And I don't know. Or explaining why one includes reputation and one doesn't. Because 875 talks about transmitting communications, and that you can harm reputation with. It's much harder to beat up somebody's reputation, right? It's much more difficult and possible to use force against somebody's reputation. Why isn't the plausible way of interpreting 951 as saying that's limited to threats of physical? And I think the answer to that is, Your Honor, that the definitions. So, 1951 deals with robbery and extortion. And in the definition of robbery, the Congress made very clear that it was limited to physical harm or, I believe. You have to point a gun. You can't just say, or threaten, I'm sorry, or threaten, I'm going to beat up your mother or, you know, kidnap your child. It's not, I'm going to say unkind things about you on Facebook. Right. So, it's, and what I was looking for, Your Honor, was the reference to person or property. That's what the definition of robbery says. The Congress then went on to define extortion and explicitly left those limitations out. I think that. I'm sorry, where was that? Okay, I'm looking at 1951B1, which is the definition of a robbery, which is limited, Your Honor, to involving person or property. By means of actual or threatened force or violence or fear of injury, immediate or future, to his person or property. And then it continues. And then in 1951B2 defines extortion and does not put those limitations in. It says extortion means the obtaining of property from another with his consent induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right, and doesn't go on to say tied to physical, I'm sorry, tied to person or property. Well, maybe because the words it uses, force and violence, are the kind of words that only apply to persons and property and don't apply to other things, so there's no need to specify. Except, Your Honor, that those words also appear in the definition of robbery. Well, counsel, is it your position, it has to be, doesn't it, that you can have wrongful use of actual or threatened force, violence, fear, and that these are three separate things? That's right. And fear, you're saying that fear could also include fear of having your reputation destroyed. That's right. And Mr. Ballow is right that there is no case holding specifically that threat to reputation is encompassed by the Hobbs Act, but of course there have been numerous cases, including in this circuit, where the threats were not having to do with economic injury or property, and those would be Pascucci, which is a Ninth Circuit case, Villalobos, which is a Ninth Circuit case, and Campbell, which is a Seventh Circuit case. Pascucci was somewhat similar to this, wasn't it? But that was fear of reputation, wasn't it? That was an exposure of a one-night affair, yes, Your Honor. And so the other thing I would say, which I think is important to emphasize, is that the Supreme Court has already said that it intended to give the Hobbs Act a very broad definition, and it did not want courts to limit it, and that if you take a look at the legislative history of the statute, the Congress was very careful in the way that it was defining its terms here. It wasn't careful enough to include reputation. Except, Your Honor, I would go back to the point I just made, which is when it talks about robbery, it specifically says person or property, but when it talks about extortion, it doesn't contain those limitations. So the other thing I would say is we haven't talked about the Nardello case, which is the Travel Act case, which is also a Supreme Court case, but the Travel Act does not contain a definition of extortion. And what the Supreme Court did was to say that the definition of extortion in the Travel Act is the generic definition of extortion. And the generic definition of extortion does include threats to expose private sexual activity. And what was happening in the Nardello case was a threat to expose then-secret homosexual sexual conduct. And so what we have is 875, which expressly says threats to reputation is included. The Travel Act, where the Supreme Court has already found that extortion, the general definition of extortion includes threats to reputation or exposed secrets. And now we have the Hobbs Act, in which cases have preceded saying threats to reputation or threats that are not about property or person also come in under the definition of extortion. And so what it would be doing would be harmonizing all three of these statutes, which all have to do with extortion. So that's the government's position with regard to the Hobbs Act. I want to respond to Mr. Ballot's discussion about inducement and his focus specifically on, quote, unquote, the tweet. The issue, of course, here is sufficiency of the evidence. The question is whether there was enough evidence in the at-trial for the jury to conclude that Mr. Brank did induce Mr. Burns to part with his property. I don't think it's right or fair to focus on one tweet. And I also don't think it's correct to minimize the tweets that came before Brank posts this, does anybody know Don, on Twitter. Before he does all of those things, he does say, you know, I can bring your house down. I have a Twitter. Lies can be made. Maybe it's the truth. I'm feeling evil. I bite. Maybe you need a taste of it. All of that, I think, is enough for the jury to say what's going on here is that he is trying to induce him to part with property. The other thing I want to focus on is that Brank then says, check your Twitter. By the time I get out of the gym, I think you're going to have a sweet treat for me. And Mr. Ballot acknowledges that that's as close as the government gets, but I think that's pretty clear that what that is is essentially a demand for money or property. And what Mr. Burns says is not, how much do you want for you to take this down? What he says is, what do you want? He wasn't asking for a donut? Yes, Your Honor, I think that's completely implausible that he was asking for additional friendships, additional nights together, or riding in cars. And if there's any doubt about that, then all you need to do is go on to see what he does almost immediately after, where he starts to say, I want both hands full of cash, I want a house, I want a car, et cetera, et cetera, et cetera. I think when you take a look at the context of what was happening here, it's pretty clear that what he was doing was trying to induce Burns to part with his money. And the Ninth Circuit has already said, where there's any ambiguity about this, you take a look at the circumstances. And that is the province of the jury. The jury is to interpret that. And if the question is, is there sufficient evidence in the record to find that Brank induced, wrongfully induced Burns to part with his money and property, I think the answer is pretty clear. What would be the consequence if we were to reverse on the Hobbs Act? If you were to reverse on the Hobbs Act, then he would be left with the 875. I got that. I meant there has to be a recalculation of the sentence. That's correct, Your Honor. And any idea what effect that would have on the time? Well, the 875 has only a two-year statutory maximum, my recollection. He received 70 months, didn't he? He did receive 70 months. And on that point, I think what Judge Walter said is, you know, I see that I'm out of time, but if I may just finish this thought, and also I'm happy to answer any questions about the interstate commerce issue. But we can't give a much lower sentence because it would minimize the serious import of what kind of crime this is. And especially given the sort of day and age that we're living in, and given what Mr. Burns testified to, how fast this stuff can get out there and how much damage that can do to someone's reputation, that makes sense. Are you saying that with the counts that are left, if we were to reverse on the Hobbs Act counts, the maximum sentence would be 24 months? So if you were to reverse on the Hobbs Act, that would do away with count two and count five. And to be honest, Your Honor, I don't have at my fingertips what the statutory maximum is on the Hobbs Act. Count six. But count six goes off of count five, so it would do away with that as well. So it would just be the two-year statutory maximum on count one. I'm sorry, so all that would be left is count one? I asked Mr. Bauer the same question, and he came up with other counts that he thought would survive. If you do away with the Hobbs Act, then count three and count four are the receiving of proceeds of extortion. So it may be those, Your Honor, and I don't have the statutory maximum left on that. Or I don't have the statutory maximum on those counts, three and four. You're saying three and four would remain or would not remain? No, I think they would not remain. I think they would not remain because if count two is out, which is the extortion, then I don't know how we get count three and four, which is receiving the proceeds of extortion. I don't understand. Why wouldn't it be extortion under 875? Well, 875 punishes transmitting. 875D was transmitting a threat in interstate, transmitting communication with intent to extort. Right. And then I don't think that we – I'm sorry, why wouldn't the proceeds from that be – Well, I don't know that we would have proven extortion at that point. I'm sorry? I don't know that the government would have proven extortion. We would have proven – Mr. Bauer is helping you out there. Thank you. Yes, we would be left with count three and count four. Well, what is the – And I don't know the statutory maximum on Section 880, Your Honor. I don't have it. I don't recall it. Is it a fraud statute that would be – 880, does that contain – 880 is – Three years. 880, three years. Okay. I'm sorry, Your Honor. So then there would be guidelines calculation under 875 and 880, and would that be cumulative, or how does that work? I don't know the answer to that, Your Honor. And I don't want to guess at it. When they use the amount involved, essentially the extortion amount? Yes. But it would be – the maximum would be three years? On count three and four and two years on count one. Would the Court like me to address the interstate commerce issue? My time is up, but I'm happy to do that. Thank you. Thank you, Your Honors. Thank you kindly, Your Honor, for the time. If I could have just two minutes, I'd like to make a couple of points about the Hobbs Act piece. I'd like you to make one point, and I don't want to take away from your two minutes, but could you give us your – how you would distinguish Pascucci? Yes. Pascucci, it's on my list of things to talk about. Thank you. They did not deal with fear of reputational harm. Pascucci, as this case theoretically could have been tried, was decided on an economic harm theory. What went up to this Court was a question of whether there was enough threat to interstate commerce was the challenge, and the Court noted that because the defendant sent the videotapes to the employer, that that sustained the theory of economic harm, and it had a sufficient connection to interstate commerce to bring it within the ambit of the Act. And so it was an interstate commerce case. It did not validate the reputational harm theory, as my colleague suggested. The other couple of cases I'll just mention is I think my colleague gets Jackson wrong. It's not a fear of reputation case. When it described the two acts that we've been describing today, it discusses whether the wrongful element that's expressed in 875D also applies to 1951 Hobbs Act extortion. It found that it did. That wrongfulness needs to be an element that's proven. That's what Jackson decided. The broad definition my colleague refers to about the Hobbs Act only refers to the breadth of its interstate commercial reach. Now, too, does the best summary of that. Judge Wenquist starts the opinion with that discussion, and he brings up Edmunds' discussion of the rule of lenity because the Court is going to use that assessment, both in now two and, unsurprisingly, now three, to limit the statute. So they are adopting restrictive readings in the last decade. And Nardello, what we miss about the Travel Act is Nardello not only doesn't define extortion specifically, it doesn't because it imports any other violation of state law. And what Nardello discussed was if the defendant agreed you could use Utah law in this blackmail scheme, why can't we also – part of the crime took place in Pennsylvania, I believe it was. Why can't we use Pennsylvania law when the statute refers to state law? And the Court could find no reason that the Court's assessment was essentially, we're not going to look at the labels state courts uses for crimes and how they label them. We're going to look at the substance of it, and if it fits the defendant's conduct under the Travel Act with the other elements, that will be good enough under the Travel Act. Let me ask you one question. Are you saying that you could, under the Hobbs Act, prosecute if you showed that the threat to the reputation would result in economic harm? No, if you threatened economic harm, for example. Well, I suppose you said threatened – you threatened – it's a movie actor who's known as a great iron man. And you say I'm going to let your studio know that you're gay. Yeah, I'm calling your studio. You're in negotiation with Sony for the new Spider-Man. I'm going to take this action to make sure you don't get that contract. I'm going to make sure I disrupt your business. That is what the Hobbs Act is. And they intentionally chose in this case not to pursue that theory, and there's probably good reasons for it. And that's why when they had the superseding indictment on the eve of the first trial, they shoehorned this Hobbs Act in 924C to really raise the stakes on it. But it was always an 875D case because it's an 875D case. But, yeah, the Hobbs Act absolutely covers – it's been interpreted to cover threats to economic harm. But you have to – that wasn't alleged in the indictment, it wasn't proven, and it wasn't instructed to the jury. It's a different theory. And they may well have brought that case. They didn't. The last piece I would ask you to look for is the beauty of Rule 29. It's a hard standard. I get it. But we have all the texts. And the only thing he said before the tweet is basically, don't be nasty with me, I'll mess you up. And that's legitimate. And we say that to people all the time. Don't talk to me that way. I'll mess you up. Is that okay? I meant verbally. What about the request for the treat? Oh, that's after the fait accompli. I think that's – I don't disagree with – I don't disagree with Burns' testimony or the notion that Mr. Brank wanted money to take down the tweet. And he accepted money to take down the tweet, and he accepted a car to take down the tweet. My point is he wasn't threatening to do anything else, and that's what extortion is. He took his action, and Burns testified. It's not a theory. Burns testified. He was concerned about retweets. You can't stop it. Every minute that tweet's out there is one more minute it's going to be tough for me to survive this. I gave him the money to take down the tweet. And the questions on direct were, why were you so fast to give him a car?  I needed him to take down the tweet. Well, you could look at that as a threat to keep the tweet up. The threat of status quo? Yes, a threat to maintain a statement that's going to do you economic harm. I think the threat to do nothing is doing nothing. It's a threat of action. Well, doing nothing may have a great deal of harm. Oh, I'm not saying that. Burns might not have been harmed. He violated the Mann Act. He had a lot to be afraid of. He violated the Travel Act. This guy had genuine fear. A captive industry flying prostitutes around to orgies on a plane interstate? That's some bad news. He had plenty to fear. I'm not disputing any of that. But you have to threaten to take action under extortion. And he took his action. I guess it's the law school example, right? You've all taught at law schools at some point, I'm sure. You can't threaten as a lawyer, a criminal. I've also actually gone to law school. I'm going to go. You can't threaten criminal prosecution against civil advantage. So the first-year exercise is you're going to involve a mediation. You're an opponent. You know he committed these acts. What do you do? And my friend, Raghesh Tangri, has his story of how he solved the problem, which is the person walked in. He says, Welcome to our negotiation over this battery case. I've just called the cops and reported you for everything you've done wrong. Now let's settle our case. That's not a violation of the rule. It's creative. He's worried about that tweet being up there. Yes, absolutely. He said, I'm going to not maintain that tweet for the rest of my life. He's worried about other people joining it. He's about other people retweeting it. These are his fears. But that's not the threat of Mr. Brank. Mr. Brank has to threaten future action. What about his statement where he says, Check my Twitter. The conversation will grow. Isn't that basically a statement that it will grow because of what the defendant's going to do and is doing? No. It's going to grow because of what he's done. No, because he's maintaining it. It's going to grow because he's maintaining that threat. Because he's not taking future action. I guess that is a wonderful question, Your Honor. Well, that's why I went to a real law school. As did I. That's the real question. But is threatening to do nothing to maintain the status quo, is that a threat of future action? I don't think it is a threat of future action. It's a threat of non-action. That's not coming out. You and I may disagree with that. I think you can threaten to maintain something that is doing harm as opposed to taking it down. And threatening to maintain something that is going to do you harm, to me, would be a threat of future action. But he's not maintaining it. Twitter's maintaining it. He just put it out there. He's made the announcement. But he can take it down, can't he? Yes, and he did for money. He said, You'll have a sweet treat for me that will make me erase my tweet. Yes, you're going to induce me to take action. In other words, I will maintain it unless you do what I say. I think we're on the right side of that line, but it seems like I'm at the end and way over. I'm not getting traction, but I thank you for your patience and the argument. Thank you very much for the arguments, both of you. Case just argued will be submitted.
judges: Reinhardt, Kozinski, Berg